**ERIC E. NELSON**
**Special Assistant U.S. Attorney**
**BRYAN R. WHITTAKER**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**901 Front Street, Suite 1100**
**Helena, MT 59626**
**Phone: (406) 457-5120**
**FAX:  (406) 457-5130**
**Email: Nelson.Eric@epa.gov**
      **Bryan.Whittaker@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    **Plaintiff,**<br><br>  **vs.**<br><br>**JOSEPH DAVID ROBERTSON,**<br><br>    **Defendant.** | **CR 15-07-H-DWM**<br><br><br>**UNITED STATES'**<br>**SENTENCING**<br>**MEMORANDUM** |

    The United States by and through its counsel, Bryan R. Whittaker, Assistant

United States Attorney, and Eric E. Nelson, Special Assistant United States

Attorney and for the District of Montana, files its Sentencing Memorandum.

1

## I.    Introduction

The United States recommends that the advisory Guideline range should be 46-57 months.  The § 3553(a) factors confirm that a sentence within the Guideline would be reasonable and not greater than necessary.  But the United States also recognizes that the defendant is a 77-year old man and thus a downward variance may be warranted.  The government leaves the variance question within the sound discretion of the Court.  The Court should order Robertson to pay $131,662 in restitution.  The Court should further order that Robertson be placed on Supervised Release for three years.

## II.    Guideline Calculation

The United States agrees with the base offense level of six under §2Q1.3, PSR ¶ 47; a six-level increase because the offense resulted in an ongoing, continuous, or repetitive discharge of a pollutant into the environment pursuant to §2Q1.3(b)(1)(A), PSR ¶ 48; and a four-level increase because the offense involved a discharge without a permit pursuant to §2Q1.3(b)(3), PSR ¶49.  The United States also agrees with a criminal history score of three due to Robertson's prior convictions pursuant to §§4A1.1(c), 4A1.2(c), thereby resulting in a criminal history category of II.  PSR ¶¶ 60-64.

The United States submits that the Guideline calculation should include a two-level increase for obstructing or impeding the administration of justice

2

pursuant to §3C1.1; and a four-level increase because the offense required a cleanup at substantial expenditure, pursuant to §2Q1.3(b)(3).

Accordingly, the correct offense level should be 22, with a category II criminal history, resulting in a Guideline range of 46-57 months.

### A.     Robertson's offenses resulted in an ongoing, continuous, or repetitive discharge of a pollutant into the environment.

The PSR properly applies a six-level offense level increase under §2Q1.3(b)(1)(A) because Robertson's Clean Water Act offenses resulted in an ongoing, continuous, or repetitive discharge of a pollutant, *i.e.*, dredged and fill material, into the unnamed tributary and adjacent wetlands at issue in Counts I and III of the indictment.

The defendant objects to this increase because he claims there was no "actual environmental contamination."  Application Note 4 states that "Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination," but allows a departure of up to two levels in either direction depending upon "the harm resulting from the . . . discharge, the quantity and nature of the substance or pollutant, the duration of the offense, and the risk associated with the violation.  *Id.*

In *United States v. Ferrin*, 994 F.2d 658 (9th Cir. 1993), the court construed similar language in §2Q1.2(b)(1).  The defendant in *Ferrin* had been convicted of illegal disposal of hazardous waste, but the disposal had taken place in a dumpster,

3

and "owing to the fortuitous intervention of authorities there was no actual contamination." *Id.* at 664. The court distinguished offenses such as the Clean Water Act offense at issue in *United States v. Goldfaden*, 959 F.2d 1324 (5th Cir. 1992) that "necessarily embrace" a contaminating discharge, from the hazardous waste disposal offense at issue in *Ferrin* that "may or may not result in de facto contamination." *Id.*; *Ferrin*, 994 F.2d at 663. If the offense of conviction does not necessarily embrace contamination, then a showing of actual contamination is required. *Id.* The court remanded the case for the district court to consider whether gas from the hazardous waste in the dumpster might have entered the environment. *Id.* at 664.

Here, the offense of conviction for Robertson, like the offense in *Goldfaden*, "necessarily embraces" a contaminating environmental discharge. Robertson was convicted of two counts of discharging pollutants "into a water of the United States." Doc. 3, 204. Thus, proof of actual contamination in this case is established by the nature of the offense of conviction and §2Q1.3(b)(1)(A) applies.

Even if a separate showing of actual contamination was required, the PSR correctly notes that such a showing has been demonstrated by the Army Corps of Engineers' conclusion that "unauthorized dredged or fill material was discharged into the unnamed tributary to Cataract Creek and the wetlands adjacent to the tributary," and that such discharges occurred during the construction of nine

4

unpermitted ponds during the October 2013 to October 2014 timeframe charged in

Counts I and III of the indictment.  PSR ¶ 48, Addendum, p. 5.

The PSR also correctly notes that the defendant's illegal discharges occurred

on repeated occasions, and occurred even after the defendant had been directly

advised that his conduct required authorization from the Army Corps of Engineers.

*See* PSR ¶ 21 (first observation of excavation activity in October 2013); ¶ 22

(November 6, 2013 observation of additional excavation, defendant's admission

that he performed the work, and direct instruction to defendant to contact Army

Corps before conducting further work); ¶ 32 (November 15, 2013 observation of

additional unauthorized excavation work in defiance of advice); ¶ 25 (May 20,

2013 observation of additional excavation work and deposit of dredged and fill

material within stream; defendant's admission that he performed additional work);

and ¶ 28 (October 21, 2014 video footage showing additional excavation activities

since last visit on May 20, 2013).

*Ferrin* distinguished the showing of contamination necessary to trigger the

enhancement under the similar §2Q1.2(b)(1) from the factors that a court can

consider in departing two points in either direction once the enhancement is

applied:

> Thus a finding that the hazardous waste came into contact with land or
> water or was released into the air is the appropriate predicate for an
> enhancement under subsection (b)(1).  Even a small amount of
> hazardous substance may suffice for an upward adjustment although,

5

pursuant to application note 5, the district court retains the authority to depart two points in either direction depending upon the amount of harm to the environment, the quantity discharged, the nature of the substance involved, and the duration of and risk associated with the offense.

*Ferrin*, 994 F.2d at 664.  *See also*, *United States v. Van Loben Sels*, 1999 U.S. App. LEXIS 38091 (9th Cir. 1999) at **15-16 (district court's refusal to apply six level enhancement under §2Q1.3(b)(1) on the ground of government's failure to prove that effluent discharged into the environment contained hazardous levels of benzene was clearly erroneous.  Evaluation of hazard should have been considered in whether to depart two levels in either direction).

To the extent defendant's objection could be construed as a level of harm argument relevant to a two-point departure under Application Note 4 to §2Q1.3, it is without merit.  As the PSR recounts, expert testimony presented at trial established the high ecological value of the headwater tributary and adjacent wetlands that were destroyed and altered by the defendant's illegal dredging and filling conduct; why those types of waters play such an important role in the downstream health of Montana fisheries; and how much time, difficulty and expense will be necessary to restore their functionality.  PSR ¶ 29 (testimony of Montana Fish, Wildlife and Parks fisheries biologist Ron Spoon); ¶¶ 27, 30 (report and testimony of fisheries biologist Darin Watschke); ¶ 31 (Scott Gillilan estimating a restoration cost of $131,662 to $136,662 to restore the high value

6

tributary and wetlands); and ¶ 32 (summary of size and extent of areas disturbed by the excavation activities; unstable nature of the dams and berms constructed by the defendant; and Army Corps of Engineers conclusion that dredged and fill material had been deposited in the tributary and adjacent wetlands).[1]  Accordingly, the record does not support a downward departure from the six-level increase that the PSR properly applies under §2Q1.3(b)(1)(A).

### B.     Robertson's offenses involved a discharge without a permit.

The PSR properly applies a four-level increase under §2Q1.3(b)(4) because the offense involved a discharge without a permit.  Application Note 7 of this subsection states that (b)(4) applies "where there was a failure to obtain a permit when one was required."  Here, Robertson was convicted of two Clean Water Act counts that include the element that the discharge was "without a permit issued under 33 U.S.C. § 1344."  Doc. 3, Doc. 204.  *Ferrin*, 994 F.2d at 664-665 (holding that increase under §2Q.2(b)(4) for lack of a permit applied:  "Indeed, an element of the offense to which Ferrin pleaded guilty, the illegal disposal of waste in violation of 42 U.S.C. § 6928(d)(2)(a), is lack of a permit.").

---

[1] The PSR mentions, but properly does not include in its Guideline calculation, a "report" by Kagel Environmental, LLC, that was obtained by the Probation Office from online internet sources, and based on a purported site visit by the two principals of Kagel Environmental on April 23 and 24, 2016 -- after the trial in this matter had concluded.  PSR ¶¶ 33-36.  The PSR correctly notes that the accuracy of the information in the report is unknown, and the United States objects to its inclusion in the PSR.

The defendant argues that he was not aware that he needed a 404 permit and that he disagrees that he legally needs a permit because of lack of legal clarity on what constitutes "waters of the United States."  Defendant's lack of knowledge of the law is not an element of the Clean Water Act offenses for which he was convicted, and is not a defense to the application of this special offense characteristic. *Ferrin*, 994 F.2d at 665:  "It does not matter whether [Ferrin] was aware that the navy did not have a permit."  Application Note 3 for §2Q1.3 states that, "The specific offense characteristics in this section assume knowing conduct." A knowing mental state does not require proof of knowledge of the law.

Moreover, as the PSR notes, "the defendant was aware of the process necessary to obtain a permit and failed to do so prior to constructing the ponds." PSR ¶ 49, and that he was specifically advised of the requirement by EPA Special Agent Kelly Siler of that requirement on November 6, 2013.  PSR Addendum, p. 5, response to defendant's objection to PSR ¶ 49.

The defendant also incorrectly argues that the application of this adjustment depends on the "nature and quantity of the substance involved."  *Id. citing* Application Note 7.  Those factors, however, only address whether a departure of two levels upward or downward may be warranted, not whether the four-level increase should be applied in the first instance.  Again, however, the PSR's recount

8

of the expert testimony and expert reports belies any basis for a downward

departure from this four-level increase under §2Q1.3(b)(4).

**C.    The offenses resulted in a cleanup that will require a substantial expenditure.**

The Guideline computation should include a four-level increase under

§2Q1.3(b)(1)(3), which applies "[i]f the offense resulted in a disruption of public

utilities or evacuation of a community, or if cleanup required a substantial

expenditure."  *See*, *e.g., United States v. Phillips*, 367 F.3d 846, 857-859 (9th Cir.

2004)*, cert. denied*, 543 U.S. 980 (district court must include all reliable costs of

cleanup, even if not incurred under the statute of conviction, in its substantial

cleanup expenditure analysis); *United States v. Eidson*, 108 F.3d 1336, 1344-45

(11th Cir. 1997), *cert. denied,* 522 U.S. 1004 (1997) (preliminary site examination

costs and reliable estimates of future cleanup costs are properly considered in

substantial cleanup expenditure calculation).

While there is no bright line rule as to what constitutes substantial, cleanup

costs that are at or more than $100,000 have been found to be substantial.  *See,*

*e.g.*, *United States v. Bogas*, 920 F.2d 363, 369 (6th Cir. 1990) (holding that,

"[h]aving reviewed the cost data carefully, we are satisfied that the expenditure of

tax dollars required for the cleanup came to a six-figure total.  The finding that

cleanup did not require a "substantial" expenditure was clearly erroneous.");

*United States v. Chau*, 293 F.3d 96, 100 (3d Cir. 2002) ($200,000 is a "substantial

expenditure" for purposes of sentencing enhancement); *United States v. Cunningham*, 194 F.3d 1186, 1202 (11th Cir. 1999) (cleanup expenditure of $147,716.66 was "substantial" for purposes of enhancement).  Courts in the Ninth Circuit have similarly applied the enhancement for six-figure cleanups, while declining to apply it to a low five-figure cleanup expenditure.  *Cf. United States v. Evertson*, 2013 U.S. Dist. LEXIS 32481 (D. Idaho 2013) (enhancement applied for $421,049 cleanup); and *United States v. Merino*, 190 F.3d 956, 958-959 (9th Cir. 1999) ($32,000 cleanup not substantial expenditure for purpose of adjustment).  The adjustment extends to "any cleanup related to the offense," *Cunningham*, 194 F.3d at 1202, and applies regardless of who pays for the cleanup.  *United States v. Williams*, 195 F.3d 823, 828 (6th Cir. 1999).

Here, the total costs for restoring the tributary, adjacent wetlands and stream crossing that were injured by Robertson's offenses of conviction are estimated to be $131,662 to $136,662.  PSR ¶ 31.  The PSR Addendum cited the six-figure cutoff in the 1990 *Bogas* opinion, but applied an inflation adjustment to conclude that the present day value of that cut-off would be $183,807; declined to apply the adjustment; and deferred to the Court as being in the best position to rule on its applicability.  PSR Addendum, p.3.

As the Addendum notes, there is no bright line rule as to when cleanup costs are deemed substantial.  *Id.*  The cases addressing the adjustment do not apply a

mathematical formula, but generally are in agreement that a six-figure cleanup should be considered substantial. Moreover, the court should consider the testimony and reports of the government's experts on the valuable functions these types of headwater tributaries and wetlands provide to downstream waters, and how difficult and time consuming it will be, even if the recommended restoration is paid for and implemented, for this natural system to return to its fully functioning state. Consequently, the required cleanup expenditure should be considered substantial, and the offense level should be increased four levels in accordance with §2Q1.3(b)(3).

      **D.**    **Two levels should be added under §3C1.1 because Robertson attempted to obstruct justice.**

There should be two levels added under §3C1.1 for obstruction. The basis for the enhancement was recognized by the Court as outlined in PSR ¶ 41. Robertson knew exactly what he was doing when he twice referenced the prior trial during his testimony at the second trial. He was trying to game the system and was attempting to cause a mistrial. Furthermore, his testimony was an attempt to unlawfully influence the jury. He purposely wanted to influence the jury by conveying to them, that there had been a previous trial and that the jury obviously did not unanimously convict him and thus they should not either. As the Court recognized, Robertson had been warned by his attorney not to talk about the previous trial. Similar conduct such as a defendant blurting out in open court [at

trial]: "I want to fire [my] lawyer because I believe she's working with the prosecution," has been found sufficient to support a two level enhancement under §3C1.1. *United States v. Balsam*, 203 F.3d 72, 89 (1st Cir. 2000). Here, Robertson did not just blurt it out once, but on two separate times about the previous trial. It was a calculated effort by him to obstruct justice.

The PSR declines to apply the enhancement reasoning that Robertson is 77 years old and has mental health issues. PSR ¶ 43. This seems to suggest that Robertson may not have fully comprehended what he was doing or what was happening. But the record shows otherwise. Robertson was evaluated by Dr. Michael Scolatti and found that while he may be suffering from PTSD, he was able to fully understand his case and the legal proceedings. Likewise, Dr. Scolatti testified that Robertson's age did not prevent him from entirely understanding what was happening and from participating fully in his defense. Robertson's mental faculties fell within the normal range. Robertson fully knew what he was doing when he tried to improperly influence the jury and to cause a mistrial by twice referring to the previous trial. Robertson attempted to impede or obstruct the administration of justice during the prosecution of the offense. Thus, two levels should be added in under §3C1.1. PSR ¶ 52.

As a separate basis for the enhancement, Robertson is trying to intimidate USFS officials in the prosecution of this case. Since his conviction in April,

Robertson appeared on a radio program called Radio Free Redoubt hosted by John Jacob Schmidt. Robertson has indicated that he may call upon armed militia protestors to defend "his property" should the USFS make any attempts to reclaim/restore the destroyed area similar to the type of armed standoff that occurred at the Malheur National Wildlife Refuge in Harney County, Oregon.

### E.    Robertson's criminal history is correctly calculated.

The PSR properly calculates Robertson's criminal history score as three due to his prior convictions for three separate misdemeanor offenses pursuant to §§4A1.1(c), 4A1.2(c), establishing in a criminal history category of II. PSR ¶¶ 60-64.

The PSR properly rejects Robertson's objection that the first two misdemeanor convictions should not be counted because they are similar to trespassing offenses that are only conditionally counted under §4A1.2(c)(1). PSR Addendum, p. 6.

The first two misdemeanor convictions include convictions that go well beyond mere trespass, and encompass conduct of causing damage to National Forest System lands: 1) "excavated trench barriers with a backhoe across the road the [USFS] officer had previously opened." PSR ¶ 60; and 2) excavated Forest Service Road 8698 by installing a "new culvert with road fill material placed in the

roadway," and causing "resource damage resulting from heavy machinery pushing soils into a pile."  PSR ¶61.

Application note 12 to § 4A1.2 provides:

In determining whether an unlisted offense is similar to an offense listed in (c)(1) or (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

*See also United States v. Grob*, 625 F.3d 1209 (9th Cir. 2010) (discussing and applying the common sense approach set forth in application note 12).  Here, while some of the past misdemeanor convictions of Robertson for violating Forest Service regulations could be deemed similar to trespass, his convictions for damaging National Forest lands are not.  The Ninth Circuit has distinguished trespass and loitering offenses from offenses that involve theft or damage to property in determining whether they should be included in criminal history calculations.  *See*, *e.g.,* United *States v. Delong*, 521 F.App'x. 617, 619-620 (9th Cir. 2013) (prior conviction for utility tampering was properly included in criminal history calculation, because it was more akin to theft than to trespassing); *United States v. Coleman*, 426 F.App'x. 515, 516 (9th Cir. 2011) (prior conviction for

vandalism included in calculation because it involves destruction of property and is not similar to loitering).

Moreover, Robertson's level of culpability for those offenses is high, and the commission of those prior offenses indicates a likelihood of recurring criminal conduct—*i.e.,* repeated damage and injury to National Forest lands and roadways using a mechanized backhoe after being told by USFS officials to stop.

Even if Robertson's past convictions were deemed to be similar to trespass under §4A1.2(c)(1), it would still be counted if "the prior offense was similar to the instant offense."  §4A1.2(c)(1)(B).  Here, as the PSR correctly concludes, Robertson's conviction under Count II of the indictment for willfully injuring property of the United States is similar to the prior offenses.  PSR Addendum, p. 6. While the felony penalty under 18 U.S.C. § 1361 is higher and requires that the injury exceed $1,000, it is in other ways similar in nature to Robertson's previous misdemeanor convictions.  He used the same instrumentality (mechanized backhoe), and cause injury to National Forest lands and roadways.  *See*, *e.g.*, *United States v Sunchild*, 2016 U.S. App. LEXIS (9th Cir. Feb. 11, 2016) (previous conviction for stealing money orders was countable, because it was not similar to offense of "insufficient funds check" listed in §4A1.2(c), and was more similar to instant offense of conviction for theft of funds from wellness center).

15

The two misdemeanor convictions cited in PSR ¶¶ 60-61 are properly counted, and together with the misdemeanor theft conviction described in PSR ¶ 62, results in a criminal history score of 3 and a criminal history category of II.

## III.   The § 3553(a) factors confirm that a sentence of imprisonment is both reasonable and necessary.

### A.   Robertson is defiant and has no respect for this Court, for your Honor, for Magistrate Judge Lynch, for law enforcement, or for the law.

Robertson is wholly unwilling to conform his conduct to the rule of law when it does not suit him or when he does not believe that the law inures to his benefit.  Instead, he simply ignores, makes excuses, and outright defies that law.  He has demonstrated a pattern of repeated defiance both toward the law and those who sustain and uphold the law.

Robertson's defiance dates back at least ten years when he decided to block a forest service road.  PSR ¶ 60.  After being told by the USFS that he could not block the road or free range his livestock on the forest, Robertson used his backhoe to excavate trench barriers across the very road officers had just opened and told him he could not block.  *Id.*  Citations were issued and Robertson was convicted on five different counts.  *Id.*

Several years later, Robertson again was cited and convicted for constructing a pole barn on the National Forest System lands (Mohawk Load).  *Id.*  He was

ordered by Judge Lynch to remove the barn. *Id.* Robertson defied that court order, and to this day, the barn remains on the National Forest System land. PSR ¶¶ 19, 61; Gov. Trial Ex. 42. Robertson attempts to excuse his defiance by claiming that rising ground water prevented him from pulling the barn fully on his property. Def. Objections to PSR, pg. 2.

As part of that same case, Robertson also used his backhoe to excavate the stream crossing on Forest Service Road 8698 and install a different culvert in the unnamed tributary. PSR ¶ 61. He caused significant resource damage. *Id.* Robertson wrote a letter to Judge Lynch trying to excuse his illegal conduct by claiming that his unpatented mining claim (which he lied about having because he had actually forfeited it on December 30, 2010, PSR ¶ 15) gave him the special use authorization needed to excavate the stream crossing. PSR ¶ 61. Robertson further told Judge Lynch that Ron Spoon had issued and authorized him to build ponds under a state 310 permit (which he also lied about because there was no such 310 permit for work during 2011 or 2012, PSR ¶ 18), and thus the stream crossing modification was necessary. Ex. A. He was ordered to fix the crossing and remediate the damage within six months. PSR ¶ 61. He defied that Order and instead continued forward with his pond building project causing further damage to NFSL and to the same unnamed tributary.

17

Furthermore, on November 24, 2010, a civil judgment was entered against Robertson in the amount $22,920 plus interest. PSR ¶ 16. Robertson completely ignored that judgment. Jefferson County therefore sold some of Robertson's properties—including the Manhattan Lode—in an attempt to satisfy Robertson's outstanding debt. PSR ¶ 16. Robertson lost ownership of that property. PSR ¶ 16. Despite not have a deed, he refuses to acknowledge that he does not own the property. Notwithstanding his continued ownership assertions, he has not paid one nickel of the property taxes since losing ownership. Trial Tr. at 158-59.

Additionally, in this case, Robertson's wholesale disregard for the law is striking. From the first day he appeared in court before Judge Lynch, Robertson has attempted to manipulate and game the system. During his initial appearance, Robertson failed to disclose, and made willful false statements, to the Court about his assets and financial condition when making application for court appointed representation. He claimed to have little to no assets or income. Based upon those false representations, Judge Lynch appointed an attorney to represent him. But, during the first trial, evidence showed that Robertson had in fact been simultaneously paying civil counsel in an unrelated lawsuit where he was the plaintiff. After multiple hearings, and investigation by the government, it was discovered that Robertson did in fact have substantial assets he did not disclose.

18

After ordering him to pay part of his defense costs, Robertson has ignored this Court's Order in the same way he ignored the previous civil judgment. While Robertson made the first two $300 payments, he has skipped the last four monthly payments. Likewise, this Court cut Robertson a break by staying his obligation to make the $12,000 lump sum payment pending the outcome of his interlocutory appeal. That stay, however, was conditioned on Robertson notifying the Court at the conclusion of the appeal. Robertson ignored that Order by failing to notify the Court, or pay the $12,000, after the mandate was issued on June 14, 2016.

Robertson further demonstrated his lack of respect for the court or the jurors by arriving fifteen minutes late from the lunch break on the first day of trial. He tried to make an excuse that he "had a little problem with my bowels…." Trial Tr. at 124-25. But as the Court noted, this was no excuse. Likewise, this was not Robertson's first time he used the alleged bowl problem excuse to completely blow off the Court—*i.e.*, he checked himself into the VA hospital with diarrhea and did not show up for the second scheduled trial scheduled in December, 2015. PSR ¶ 82.

Additionally, Robertson defied this Court's Rule 615 witness exclusion Order at trial prohibiting the parties from talking with any witness about the testimony from other witnesses at trial. As the Court is aware, undersigned counsel had to report that during a break Robertson was overheard in the lobby

talking with a defense witness about testimony from a prosecution witness during the trial.

Moreover, as previously discussed, Robertson tried to cause a mistrial, and attempted to obstruct justice, by blurting out two different times that there had been a previous trial despite being warned not to do so by his counsel.

Robertson's long history and ongoing defiance indicates a strong need to promote respect for the law and provide for a just punishment in this case.   He has been shown leniency time after time including a probationary sentence from Judge Lynch which he flatly ignored.  He has been given chance after chance to straighten up and obey the law.  He categorically refuses.

### B.     There is a strong need to protect the public from further crimes by Robertson.

Robertson will continue to work on the ponds and commit further criminal acts.  After the first trial ended in a hung jury, the Court told Robertson that he was not to do any more work on the ponds while on pretrial release.  EPA SA Siler overheard heard Robertson defiantly say in response that he was going to finish the work.  His intent to continue his illegal activity was recently reconfirmed in an interview Robertson gave to a reporter where he stated, "[t]hey stopped me before

20

I finished."[2]  Robertson continued stating, "I have a lot of work to do. I need to put a proper drain in here one of these days."  *Id.*

A probationary sentence will do nothing to deter Robertson from committing further crimes or from "finishing" his work.  He has caused major damage to public lands and waters which will have a significant cost and burden to the taxpayers to clean up.  He has likewise caused significant damage to the individual property of Liane Taylor and, as noted in her victim impact statement, has caused substantial hardships for her.  Her property has been rendered worthless in its current state.  Robertson will continue his criminal activity unless he is incarcerated.  Probation did not stop Robertson last time and if he is given probation again he will continue to commit further crimes.  There is a compelling need to protect the public from Robertson.

### C. Robertson's past conduct, and continued defiance even after conviction, shows that the only way to deter him from continuing his criminal activity is a lengthy prison sentence.

Robertson remains defiant.  Since his conviction, Robertson has appeared on a radio program called Radio Free Redoubt hosted by John Jacob Schmidt. Robertson told Schmidt that, "Our government has beat us into the ground for no

---

[2] Helena Independent Record, *Ripples in a pond*, June 19, 2016, *available at* http://helenair.com/news/local/ripples-in-a-pond/article_2a70df89-0678-5ba0-a758-be30275bf3c2.html

reason."[3]  Schmidt responded, "[t]he federal government has their boot on his throat and we can't stand for this!"  *Id.*  Schmidt advised Robertson to consider another option in fighting the alleged federal tyranny.  He stated, "I'm not convinced that we are completely out of options here.  We have to resort to, you know, like the **2nd Amendment-type of option**.  I know some people are on this."  *Id.* (emphasis added).  Robertson responded and said he understands that the Forest Service intends to drain the ponds he constructed.  "I'll have some friends up here.  **I don't think I'll allow them to do that**."  *Id.* (emphasis added).  Robertson implied that those friends are potential armed individuals or groups with whom he has been spending significant time and recruiting to his cause.  These are some of same individuals/groups that participated in the armed occupation of the Malheur National Wildlife Refuge in Harney County, Oregon.

**D.    Robertson's history and characteristics show that a Guideline sentence is necessary and reasonable.**

Robertson is a 77-year old man with a history and propensity for violence.  By his own admission Robertson has acknowledged having "50 guns in [his] house, loaded."  PSR ¶ 86.   And that he has always had a weapon on him.  *Id.*  He may still have access to those guns, because as he recently told one reporter, he

---

[3] Hatewatch, *Antigovernment Groups Show Interest in Montana Pond-Building Case*, June 9, 2016, https://www.splcenter.org/hatewatch/2016/06/09/antigovernment-groups-show-interest-montana-pond-building-case.

was "forced [] out of his home and into a trailer because his wife keeps a gun safe in their home."[4] Thus, despite being a prohibited person, it appears that Robertson may still have access to firearms that are in his home.

Robertson has exhibited anger and domestic violence towards his spouse and toward his neighbors. PSR ¶¶ 84, 86- 87. Additionally, Robertson has repeatedly discussed violent confrontations with law enforcement and referenced a potential for an armed standoff. Indeed, he claims that if he allowed people on "his property" that the government would not like that and so he would react and there would be another "Ruby Ridge." PSR ¶ 10. Additionally, during a speech to a patriot/militia group, he claimed that when he allegedly caught EPA investigators "manufacturing evidence" it could have turned into another "Ruby Ridge" because both parties were armed.[5]

---

[4] The New American, *Montana Disabled Vet Convicted of EPA Violations; Forced From Home Because of Gun Safe*, May 16, 2016, available at http://www.thenewamerican.com/usnews/constitution/item/23189-montana-disabled-vet-convicted-of-epa-violations-forced-from-home-because-of-gun-safe

[5] NorthWestLibertyNews , Patriot Conference 2016: Plains, Montana, available at https://www.youtube.com/watch?v=zo8MxXubdTo (Robertson speaking at about 1:52:00). Robertson does acknowledge receiving treatment for his violent tendencies and says he has been treated for Post Traumatic Stress Disorder. Hatewatch, *Antigovernment Groups Show Interest in Montana Pond-Building Case*, June 9, 2016, https://www.splcenter.org/hatewatch/2016/06/09/antigovernment-groups-show-interest-montana-pond-building-case. But Robertson also says, "[s]everal years ago before I went into treatment, I would have handled this different" *Id* "But then I would have been in the news. My wife would probably be dead and so would I and some of those other people." *Id.*

Since his conviction, Robertson has looked for support from patriot/militia groups.  Robertson has attended rallies and has been very vocal in the press and on the radio/internet trying to gather support for his cause to allegedly "fight federal tyranny."[6]  Ironically, while railing against the federal government and seeking to "fight federal tyranny," Robertson willingly accepts money and every possible benefit from the government.  Indeed, for almost the past 20 years he has received extensive and weekly treatment from the VA hospital, PSR ¶¶ 79-91, his entire livelihood, other than property ownership, consists of money derived from federal benefits such as Social Security and VA disability benefits, PSR ¶ 113, and he has received the benefits of Court appointed counsel (all while still paying private counsel in his civil lawsuits).

Robertson's character is such that he thinks of nobody but himself.  He has taken no thought to how his actions affect other people.  He has given no thought to the burden caused to the taxpayers by destroying the National Forest or the Waters of the United States.  State and federal regulators testified at trial that they wanted to work with Robertson to help him do his proposed project in the proper

---

[6] Hatewatch, *Antigovernment Groups Show Interest in Montana Pond-Building Case*, June 9, 2016, https://www.splcenter.org/hatewatch/2016/06/09/antigovernment-groups-show-interest-montana-pond-building-case; NorthWestLibertyNews , *Patriot Conference 2016: Plains, Montana*, available at https://www.youtube.com/watch?v=zo8MxXubdTo (Robertson begins speaking at about 1:52:00).

manner which would also protect the interests of the public and the downstream waters.  But Robertson refused to work with them and simply did not care about anyone's interests but his own.  He likewise has given no thought to how his actions would affect Liane Taylor who is a self-employed single mother.

Moreover, Robertson's character evidences a propensity to lie and do whatever is necessary to get what he wants.   Indeed, Robertson continues to make statements and claims that are completely contradicted by the facts and the evidence.  By way of several examples, Robertson continues to claim that: 1) he owns the property where the ponds were constructed; 2) that he is "free to do with 'his land' as he pleases;"[7] 3) that he had a 310 permit which allowed for pond construction; 4) that Ron Spoon gave him permission to build the ponds; 5) that he had a valid unpatented mining claim on the Mohawk/Nation Forest System lands; 6) that your Honor is corrupt and biased against him (that there is "bad blood" between your Honor and Robertson)[8] and has specifically came out of retirement to hear this case; 7) that the EPA agents manufactured evidence; and 8) that his attorney failed to use a supposed favorable environment report at trial.  These

---

[7] Freedom Outpost, *77-Year-Old Montana Disabled Veteran Faces Virtual Death Sentence from EPA because He put Ponds on his Property*, May 14, 2016, available at http://freedomoutpost.com/77-year-old-montana-disabled-veteran-faces-virtual-death-sentence-from-epa-because-he-put-ponds-on-his-property/

[8] Montana Disabled Veteran Convicted Over Stock Pond, May 13, 2016, available at http://redoubtnews.com/blog/2016/05/13/montana-disabled-veteran-convicted-pond/.

statements are all false.  Yet, even after conviction, Robertson continues to spin a web of lies in an attempt to garner sympathy and support.

**E.    The nature and circumstances of the offense are serious and a Guideline sentence is necessary.**

The Court has seen and heard all the evidence during two trials.  As such, the government will not rehash the proof again here.  Suffice it to say that the evidence clearly demonstrated the serious nature and circumstance of this offense.  Robertson caused significant and widespread destruction.  As one witness at trial indicated, the site looks like a war zone.  Robertson was warned over and over to stop.  He did not.

Robertson still has demonstrated no remorse or contrition for his criminal acts.  He has completely failed to accept any responsibility and dismisses the fact that there was anything wrong with what he did.  He continues to insist that there was no harm done.  Instead, Robertson has chosen to play the victim blaming everyone else including the government, investigators, his attorney, and this Court.  A considerable sentence of imprisonment is needed to impress upon Robertson the gravity of his defiant criminal actions and the serious nature of this offense.

## IV.    Restitution

The PSR correctly notes that the provisions of the Mandatory Victim Restitution Act of 1996 apply because Robertson was convicted of an offense

against property under Title 18.  PSR ¶37; 18 U.S.C. § 3663A.  Restitution

includes funds necessary to remediate the harm caused by the defendant's conduct.

*See  United States v.* Sawyer, 2016 U.S. App. LEXIS 10098 (6th Cir. 2016)

(government agency forced to expend funds to remedy the harm caused by a

criminal offense can be victim to whom restitution is owed, regardless of whether

it has a possessory interest in the affected property), citing *Phillips*, 367 F.3d at

857, 862; *United States v. Brock-Davis*, 504 F.3d 992, 994, 996-998 (9th Cir.

2007) (MVRA restitution ordered to motel owner for cleanup-costs to remediate

room in which defendant had cooked methamphetamine).

The PSR cited the report of the government's expert, Scott Gillilan, which

estimated site restoration costs of $131,662 to $136,662, and selected the lower

amount as the basis for restitution, to be paid to the United States Forest Service.

PSR ¶ 138.  In ordering restitution, a district court must make "a reasonable

estimate of the loss, given the available information."  *United States v. Ali*, 620

F.3d 1062, 1074 (9th Cir. 2010) (quoting *United States v. Bussell*, 504 F.3d 956,

960 (9th Cir. 2007).  The evidence on which the court makes its calculation is

acceptable so long as such evidence is supported by "sufficient indicia of

reliability."  *Id.* at 1073.  Mr. Gillilan may testify at sentencing about the basis for

his revised estimate to implement full restoration.

In objecting to the imposition of restitution, Robertson claims that he does not have the funds to pay restitution.  However, 18 U.S.C. § 3663A mandates restitution, and under 18 U.S.C. § 3664(f)(1)(A), full restitution must be included in a restitution order "without consideration of the economic resources of the defendant."  In any event, the PSR determined that the defendant does have available financial resources and property.  PSR ¶¶ 109 -114.

The government anticipates that the USFS will be in the best position to restore the damage to the tributary and adjacent wetlands on the National Forest lands as well as on the adjoining Manhattan Lode property affected by the defendants' offense conduct in Count III of the indictment.  Based upon the statement submitted to the Court by the owner of the Manhattan Lode, Liane Taylor, we anticipate that she will consent to allowing the USFS to conduct stream and wetland restoration on her property.

**V.    The United States objects to others individuals speaking at sentencing.**

The Court has received correspondence from Robertson's friends/supporters who have indicated that they intend on speaking on his behalf at sentencing.  The United States objects to any allocution by someone who is not a party or a victim. *See* Fed. R. Crim. P. 32(i)(4).

## VI.    Conclusion

The advisory Guideline range should be 46-57 months.  The § 3553(a) factors confirm that a sentence within the Guideline would be reasonable and not greater than necessary especially given Robertson's flagrant and ongoing disregard for the law.  But, Robertson is also 77 years old and thus a downward variance may also be warranted.

DATED this 11th day of July, 2016.

MICHAEL W. COTTER
United States Attorney

*/s/ Eric E. Nelson*
Special Assistant United States Attorney


*/s/ Bryan R. Whittaker*
Assistant United States Attorney
Attorney for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to D. Mont. LR 7.1(d)(2) and CR 47.2, the United States

Sentencing Memorandum is proportionately spaced, has a typeface of 14 points or

more, and the body contains 6485 words.

*/s/ Bryan R. Whittaker*
Assistant United States Attorney
Attorney for Plaintiff